## Swift & Company v. William J. Fue.

1. NEGLIGENCE—*Violation of Ordinances.*—The violation of any statutory or municipal regulation, for the purpose of protecting persons or property from injury, is such a breach of duty as will sustain an action for negligence, if the other elements of actionable negligence concur. But if a person knows that another is violating the law, he can not base an action for negligence upon such violation.

2. SAME—*Duty of Master to Warn Servant of Danger.*—A master is bound to inform his servant of all dangers incident to the service of which he (the master) is, or could by the exercise of ordinary care, be informed, and which are unknown to the servant and can not be readily ascertained except by a person possessed of peculiar knowledge, which the master has no reason to suppose the servant possesses, and if he fails to do so he is liable to the servant for all the consequences resulting from the lack of such warning.

2. PRACTICE—*Instructions must be Submitted in Writing.*—An oral request for an instruction is not sufficient, and it is only for a refusal to give written instructions prepared and asked by a party that error can be assigned.

**Trespass on the Case,** for personal injuries. Appeal from the Circuit Court of Cook County; the Hon. RICHARD S. TUTHILL, Judge, presiding. Heard in this court at the October term, 1896. Affirmed. Opinion filed November 30, 1896.

### STATEMENT OF THE CASE.

On December 15, 1893, the appellee, Fue, lost the major portion of his left arm by having the same caught in a cooling fan in the plant of appellant; Swift & Company, of Chicago. Fue was then forty years old. He was familiar with machinery. He had canvassed for the sale of machinery, collected money, settled accounts, etc. He says: "I did pretty nearly everything, from traveling out and getting the orders for the machines, down to working upon them in the shop.

Appellee worked at appellant's during part of 1891, and all of 1892, and the greater part of 1893, as a mill-wright helper and oiler. First working as helper three or four months, then worked as oiler in what is known as the East

oil house, about twenty-one months, where he oiled two fans used to throw the air out of the room, or into it, as desired. He was then sent to what is known as the Ferguson house, which had been built a year or so, but had never been run, and was now being remodeled and put in order for running. Here appellee assisted the mill-wright in putting the machinery in order to run. Among other machinery there were five sets of cooling fans, two in each set, stationed between floors in such a way as to throw the air downward into the cooling room.

Each set of fans was inclosed in a box-like compartment, each compartment being floorless, so as not to obstruct the free passage of the air from the fan to the cooling room beneath. An eighteen-inch sill projected across the open space at the bottom of the compartment, also a three-inch joist on which one could stand. The compartments for the various sets of fans were about three feet wide, and perhaps twelve feet long, and as the compartments were continuous, they virtually formed one long box divided into these various compartments; the latter were high enough for a man to stand up in, and were reached from a passageway about two and a half feet wide, at the side of and extending the length of the series of compartments, in all, sixty or seventy feet. Each compartment had a door opening into the passageway. This passageway and the doors were used only by those who had business in the compartments, to adjust, clean, repair, or oil machinery therein. The fans were cone-shaped, having a radius of about thirty inches, and ran upon a shaft which crossed the compartment.

The flat or larger side of the cone was close to the wall of the compartment on one side, which brought the smaller end of the cone a distance of about twelve or fourteen inches from the wall. Two or three inches further from the wall was a grease cup, so arranged on the shafting as to lubricate the same. This grease cup had a "cap," and the grease was forced down into the boxing by screwing down this cap with the fingers. Transversely across the

compartment in front of each fan were placed and fastened three wooden guards to prevent any one from going against the fan. These guards were two by four stuff, and placed about ten or twelve inches apart. All the oiler had to do, was to enter the compartment through the door from the passageway, stand on this sill and joist, and reach through or over the guards to the grease cup, and screw the same down with his fingers. The shafting upon which the fan ran reached from wall to wall of that compartment, and through the wall into said passageway a few inches. Upon this few inches of projection ran shieves. These were made to turn by rope belting. Each set of fans was provided with a stopping and starting apparatus, sometimes called a friction clutch arrangement. This arrangement was two or three stories above the compartments in question, and consisted of a set of levers, one for each set of fans. By pulling a lever one way, it would start the set of fans belonging to it in operation. By pulling it the other, it would stop them. Each lever had two ropes attached to it; one passing to the right over a pulley and down through holes in the floor into this passageway, and through the passageway into the cooling room below, so that one standing in the passageway could, by pulling on one of the ropes, pull the lever so as to start the fans running, and by pulling on the other, would stop them.

For a time prior to appellee's injury he had been engaged in helping put this machinery, including the pulleys, ropes, and friction clutches connected with the fans, in order for running. Before they got the ropes adjusted, he had gone frequently to the floor where the clutches were, and started and stopped the fans by pulling the lever by hand.

Appellee was injured about one o'clock in the morning. About one o'clock it came time for him to oil the fans in question. He went down into this passageway, which was lighted by electric lights about fifteen feet apart. The first set of fans in the row had not been put to running. Appellee opened the door into the second set, and found the draft made by the running of the fans was so great that the

tubular lantern which he carried would not live inside of the compartment; that there were no lights in the compartment, but that there was sufficient light from the passageway to enable him to do his oiling safely.

He oiled the two fans in that section, and passed in the second, and finding the same state of draft, and the necessity of leaving his lantern outside, he oiled that second set. He passed into the next set, and finding the same state of draft, but sufficient light for his purposes, left his lantern outside, and oiled that set. In the two first sections which he oiled, the guard rails were placed, not at right angles across the compartment, but at an angle which enabled him to reach the grease cup without getting his arm so close to the fan as in the third section, where the guard rails were placed directly across the compartment. Appellee at this compartment, as he pressed the grease cup, stood with his left side toward the fan. He claims that he was not able to reach the grease cup with his right hand on account of the distance of the guard rails from it, and that it was necessary for him to reach in with his left hand; that he thought he could reach the cup better with his left hand; but that in doing so, it brought his arm so close to the fan that the force of the wind or draft took his arm into the fan.

There was a verdict and judgment for $3,500 for the plaintiff, from which this appeal is prosecuted.

J. A. POST, attorney for appellant; S. S. PAGE, of counsel.

BRANDT & HOFFMANN, and L. H. CRAIG, attorneys for appellee.

MR. JUSTICE WATERMAN DELIVERED THE OPINION OF THE COURT.

Upon the trial of this cause, the plaintiff introduced in evidence, against the objections of the defendant, the following ordinance of the city of Chicago:

"In every factory, workshop or other place or structure

where machinery is employed, the belting, shafting, gearing, elevators and every other thing, where so located as to endanger the lives and limbs of those employed therein while in the discharge of their duties, shall be, as far as practicable, so covered or guarded as to insure against any injury to such employes."

Among other objections to the introduction of this ordinance, it is contended by appellant that "ordinances of this character do not enter into and form a part of the contractual relations that exist between the owners of and the employes working in packing houses, imposing a duty which, if neglected, may serve as a basis for a personal action for negligence; but that they merely subject the employer or owner to such penalties as may be provided for his disobedience."

In the case of The Illinois Central R. R. Company v. Gilbert, 157 Ill. 354, speaking of a city ordinance requiring the ringing of the bell of an engine running within the limits of the city, it being insisted that the ordinance had no application to the relation of employer and employe on the right-of-way of the company, the Supreme Court said:

"The city, having the right to adopt an ordinance, whoever would be benefited by a compliance therewith on the part of the company, would be entitled to the protection that obedience to the law would furnish, whether an employe or not."

In 1 Shearman & Redfield on Negligence, Sec. 13, the law is thus laid down: "The violation of any statutory or valid municipal regulation, established for the purpose of protecting persons or property from injury, is of itself sufficient to prove such a breach of duty as will sustain a private action for negligence, if the other elements of actionable negligence concur."

To the same effect are the cases of Devlin v. Gallager, 6 Daly (N. Y.), 494; Bott v. Pratt, 33 Minn. 323; Owings v. Jones, 9 Md. 117.

Each person has a right to presume that all will comply with the law. An ordinance is a law within the territory

over which it is in force. We say each person has a right so to presume. If a person knows that another is violating the law, he can not base an action of negligence upon such presumption. In the present case it would seem that the appellee must have known that there was no such cover or guard over the wings of the fans by which he was injured, and that therefore the ordinance ought not to have been admitted in evidence. W. S. L. & P. Ry. Co. v. Thompson, 15 Ill. App. 117; C., B. & Q. Ry. Co. v. Johnson, 103 Ill. 512; McRichard v. Flint, 114 N. Y. 222, 229.

Under the assignment of errors, the admission of improper evidence can not be considered by this court.

Whatever experience appellee had had in oiling machinery, it appears that he was injured the first time he attempted to oil the fans in question. It is true he had helped to set the fans up, and that he was probably familiar with the places in which they ran, but it is not clear that from his association with machinery, or the running of fans, he had come to realize how great a suction a powerful fan exercises close to its rapidly revolving wings. We can well understand how a person might, for a great length of time, work about fans, and feel, some feet from them, the air current generated thereby, and yet not understand that close to the blades the suction they created was strong enough to push a man to one side, or move his arm against his will. The majority of persons are doubtless ignorant of the great force which a powerful fan, within a few inches of its blades, exerts upon bodies of the size and weight of a man's arm.

The master is bound to inform his servant of all dangers incident to the service, of which he, the master, is cognizant, or of which, in the exercise of ordinary care on his part, he would be informed; he is bound to warn the servant of all latent or extraneous dangers of which he himself has knowledge, or of which, in the exercise of ordinary care, he would be informed; and if he fail in this respect, he is liable to the servant for all the consequences resulting to him from the lack of such warning.

This rule applies to dangers of which the master himself

is aware, or ought to know, and which are unknown to the servant, and would not be readily ascertained except by a person possessed of peculiar knowledge, which the master has no reason to suppose the servant possesses.    Dangers which are the result of common knowledge, which can readily be seen by common observation, the servant assumes the risk of; but when the danger to be avoided requires a knowledge of scientific facts, an ordinary servant is not presumed to have knowledge of them, and it is the duty of the master, knowing of them, to inform the servant in respect thereto.    Wood on Master and Servant, pp. 714, 721, 723; Smith v. Peninsula Car Works, 60 Mich. 501–505; Atkins v. Merrick Thread Co., 142 Mass. 431–433; Ill. Cent. Ry. Co. v. Welch, 52 Ill. 183–186; Britton v. G. W. Cotton Co., L. R., 7th Exch., 130.

Applying this principle to the present case, we think the jury was warranted in concluding that the danger from the great suction exerted by this fan a few inches from its blades, was, or by the exercise of reasonable care might have been, known by appellant, and was not known by appellee, and that therefore the servant should have been warned of the danger he incurred and the risk he ran in placing his arm in a place where, from the action of this fan, he received the injury complained of.

We see, therefore, no sufficient reason for reversing the finding of the jury and the court below upon the facts.

At the close of the plaintiff's evidence, the defendant asked the court to instruct the jury to return a verdict of not guilty, which motion was denied, being renewed at the conclusion of the evidence.    Neither of these motions was reduced to writing, each being made orally.

The errors assigned, as stated by appellant, are as follows:

" 1.    That the court refused to direct a verdict of not guilty at the close of plaintiff's evidence.

2.    Refused so to do at the close of all of the evidence.

3 and 4.    Refused to grant a new trial because the judge refused to instruct the jury to return a verdict of guilty, as aforesaid.

5.   The trial court refused to arrest the judgment."

The Supreme Court in Wenona Coal Co. v. Holmquist, 152 Ill. 581–588, says:

" It is said that the trial court erred in overruling defendant's motion to exclude the evidence from the jury and to instruct the jury to find for the defendant.  The motion was made after the defendant had introduced its evidence and rested.   Section 52 of the Practice Act, passed in 1872, provides that ' hereafter no judge shall instruct the petit jury in any case, civil or criminal, unless such instructions are reduced to writing.'   (2 Starr & Cur. Stat., page 1814.) Section 53 provides that ' where instructions are asked which the judge can not give, he shall, on the margin thereof, write the word "Refused."'   (Idem, page 1815.) We find in the record no written instruction which directs the jury to find for the defendant, and which is marked ' Refused.' (L. S. & M. S. Ry. Co. v. Bodemer, 139 Ill. 596;  Pullman Palace Car Co. v. Laack, 143 Id. 242;  J., A. & N. Ry. Co. v. Velie, 140 Id. 59.)   The expressions used in the decisions to the effect that the court was ' asked to instruct the jury,' or ' requested to instruct the jury,' were intended to refer to requests made by submitting to the court an instruction in writing to be given to the jury.   (Ill. Cent. Ry. Co. v. Nowicki, 148 Ill. 29.)"

We regard this as an announcement by the Supreme Court that it is only for a refusal to give written instructions, prepared and asked by a party, that error can be assigned; that it is not sufficient to merely orally request the court to instruct the jury to find for the defendant.

This court so held in Ames & Frost Co. v. Stachurski, 46 Ill. App. 310.

The judgment of the Circuit Court is therefore affirmed.